OPINION OF THE COURT
Irving Lang, J.
The primary legal question in this highly publicized case is the constitutionality of CPL 400.20 (subd 5), which expressly permits a court to consider evidence which would not be admissible at a trial as a factor in determining whether to sentence a defendant to life imprisonment as a persistent felony offender.
The persistent felony offender statute (Penal Law, § 70.10) authorizes a term of imprisonment of a minimum of 15 to 25 years and a maximum of life in cases where the defendant has two prior felony convictions and the court "is of the opinion that the history and character of the defendant and the nature and circumstances of his criminal conduct [are such] that extended incarceration and life-time supervision [of the defendant are warranted to] best serve the public interest”. It is purely a matter of discretion whether or not to give the increased sentence to the defendant.
Specially at issue is whether confessions obtained in violation ' of Miranda to two murders for which defendant was never brought to trial can be considered by the court in a persistent felony offender proceeding as evidence of defendant’s history and character that would warrant extended incarceration.
Since this proceeding involves complicated questions of constitutional law combined with highly discretionary findings, I believe it appropriate to recount the extensive history of this case.
*913 THE BACKGROUND
The defendant was indicted in 1978 for attempted murder and assault in the first degree in that he stabbed a woman in the chest in an elevator in a building in the Washington Heights section of New York County.
During plea bargaining discussion before Justice James Leff, the defendant was offered a sentence of 7 Vi to 15 years consecutive to a substantial amount of time he owed on a prior felony conviction. At the time of the plea offer Justice Leff was aware of the defendant’s two prior felony convictions but was not aware of two murders allegedly committed by the defendant. The offer was rejected by the defendant and the case was assigned to Justice Morris Schwalb for trial. Over the strenuous objection of the District Attorney, Justice Schwalb agreed to sentence the defendant to 12Vi to 25 years concurrent with the time owed by the defendant, and the defendant pleaded guilty to attempted murder, based upon the sentence promise. That the District Attorney should not interpose an objection to a 7 Vi to 15 year sentence (proposed by Justice Leff) but decry a 12 Vi to 25 year sentence (promised by Justice Schwalb) may seem strange but in actuality reflects the anomalous state of the law at that time whereby a 12 Vi to 25 year sentence concurrent with the time owed would result in a sentence substantially less than a 7 Vi to 15 year sentence consecutive to the time owed. (Legislation has changed this situation. All felony sentences must now be consecutive to time owed [Penal Law, § 70.25, subd 2-a].)
Judge Schwalb’s proposed sentence was severely criticized, not only by the District Attorney, but in a number of newspapers. Prior to sentence the District Attorney filed a request for a persistent felony offender hearing and such a hearing was ordered by Judge Schwalb. During the hearing the allegations relating to the two murders allegedly committed by the defendant were litigated, and after the hearing the court found the defendant to be a persistent felony offender. As the original sentence promise could not be kept, the plea was vacated and the case scheduled for trial.
The first trial of the indictment before Justice Morris Goldman ended in a hung jury, but on October 11, 1979, after a retrial before this court, the jury returned a verdict of guilty of assault in the first degree, a class C felony ordinarily carrying a maximum sentence of 5 to 15 years for a first felony offender and 7 Vi to 15 years for a predicate felony *914 offender. The jury was unable to reach a verdict on the attempted murder charge.
Following the conviction, a hearing was ordered pursuant to CPL 400.20 to determine whether Charles Wright should be sentenced as a persistent felony offender.
Preliminarily two issues, one raised by the People and one by the defendant, should be ruled upon.
LAW OF THE CASE
The People contend that Judge Schwalb’s finding that the defendant is a persistent felony offender should bind this court on the doctrine of "the law of the case”. The People claim that Judge Schwalb found that defendant had in fact been constitutionally convicted of felonies on two prior occasions and that "defendant’s background and character are such that he should be sentenced as a persistent felony offender.” I agree that "a court of co-ordinate jurisdiction * * * ordinarily should not disregard an earlier decision on the same question in the same case.” (Walker v Gerli, 257 App Div 249, 251; see, also, United States v United States Smelting Co., 339 US 186, 198 [dictum]; Martin v City of Cohoes, 37 NY2d 162, 165.)
I hold that the finding by Judge Schwalb that the defendant has two prior felonies constitutionally obtained is binding on this court, since that is a pure legal determination; but I do not agree that I am bound by the finding that the defendant is a persistent felony offender. That determination is purely discretionary on the part of the sentencing court and may not be based on another Judge’s decision. Further, the key issue in this case, i.e., the constitutionality of the use of confessions, was not litigated before Judge Schwalb by either party; rather it was brought to the attention of the parties by this court sua sponte. The rule of the "law of the case” is a sound one, but should apply to legal rulings rather than discretipnary findings.
THE COURTS AND THE MEDIA
The second issue, raised by the defendant, is that the sentence promise given by Judge Schwalb should be enforced since it was not kept solely because "the People exerted unethical pressure on the court by exposing the defendant’s case and background to the news media. It was the news *915 media involvement in this case that persuaded Mr. Justice Morris Schwalb to reconsider his position on a sentence promise made to this defendant in April 1979, because the People 'dislike’ the sentence promise negotiated from that Court by this defendant.”
The defendant’s contention is rejected. There is nothing in the record to indicate that Judge Schwalb’s change of view was dictated by anything other than the extensive testimony before him at the hearing. The hearing unearthed material which was not known to him at the time of the plea negotiation and justified the change of position (see People v Selikoff, 35 NY2d 227, cert den 419 US 1122). Obviously no court should change its determination solely because what it believes to be an appropriate ruling is criticized by the press, prosecutor, or public. (See Matter of Fernandez v Silbowitz, 59 AD2d 837.) On the other hand, if criticism is justified it would be equally improper to stubbornly adhere to an inappropriate ruling solely to manifest judicial machismo.
THE HEARING
Charles Wright’s criminal history dates back to June 3, 1960, when he pleaded guilty in the Court of General Sessions, New York County, at the age of 16, to attempted assault in the second degree. The basis for that conviction was the stabbing of 34-year-old Thelma McDowell on February 19, 1960, in her apartment building at 560 West 151st Street at 11:30 p.m. The defendant was arrested and admitted his guilt, stating that he had had an urge to stab a woman. He was denied youthful offender treatment and was sentenced to an indeterminate term of imprisonment, serving four years before being paroled on September 14, 1964.
Shortly thereafter in January of 1965, there began a ''reign of terror” in the Washington Heights neighborhood. On January 9, 1965, the body of 41-year-old Gertrude Mason was found in the elevator of her apartment building at 47 Fort Washington Avenue. She had been stabbed 18 times and was stripped from the waist down.
On February 14, 1965, at about 11:00 p.m., 37-year-old Annie Wallace was the victim of an attempted rape in the elevator of her apartment building at 628 West 151st Street.
On February 19, 1965, at approximately 1:00 A.M., 50-year-old Sylvia Mondejar was grabbed in the elevator of her *916 building at 564 West 160th Street and taken to the roof where she was raped.
On March 12, 1965, at about midnight, Geraldine Linder was assaulted in the hallway of her apartment building at 762 Riverside Drive.
The description given by the victims of the assailant was similar: a trim, light-skinned, young black man who was extremely neat and soft spoken and who walked with a mild bounce. On the basis of their descriptions, a police sketch was drawn and circulated.
On May 21, 1965, at approximately 3:25 a.m., the body of Pauline Lubetsky was found stabbed to death in the sixth floor hallway of her building at 600 West 162nd Street. She had been stabbed 32 times and was nude except for a brassiere. A trail of blood led from the elevator into the hallway where the body was found.
On June 1, 1965, Charles Wright was picked up as a suspect on the basis of the police sketch and questioned. He confessed to the two homicides and was subsequently indicted for 10 counts of murder, rape, sodomy and assault. The two murder counts were severed on November 30, 1966, and on December 1 the defendant pleaded guilty to rape in the first degree to cover the afore-mentioned charges. On January 20, 1967, Justice Charles Marks sentenced the defendant as a second felony offender to a term of imprisonment for a minimum of 30 years and a maximum of 40.
On that same day the two murder counts were dismissed. The only evidence against the defendant was the confession, which was deemed inadmissible since he had not been advised of his right to have an attorney present during the custodial interrogation. The case of Miranda v Arizona (384 US 436) had been applied retroactively to all cases involving crimes committed prior to June 13, 1966, and not yet tried by that date. The confession of June, 1965 would not stand therefore due to the delay in prosecution for over a year.
On September 1, 1977, Charles Wright was paroled by the Board of Parole, having served only 1214 years of his 30-year minimum sentence.
On April 5, 1978, the defendant was once again arrested and charged with the attempted murder of a 25-year-old woman, who had been stabbed in the chest with a knife at *917 approximately 1:30 a.m. while in the elevator of her apartment building on Riverside Drive. This is the instant case.
Since the principal issue concerns the admissibility of the 1965 murder confession as evidence in a persistent felony offender proceeding, it is necessary to examine in more detail the facts and circumstances surrounding the investigation and apprehension of the defendant at that time.
Sergeant Fahey, who in 1965 was second in charge of the detectives at the 30th Precinct, and the Honorable Patrick W. McGinley, who, as an Assistant District Attorney in New York County, was assigned to the homicide bureau in 1965, testified for the People about the investigation.
When Sergeant Fahey received a phone call in the early morning hours of January 9, 1965, notifying him of a homicide, he immediately went to the scene. He observed the body of Gertrude Mason lying face up in the elevator, her head jamming the door so it could not close, her upper clothing pushed up and her underclothing pulled down around her ankles. He noticed one peculiarity: she was not wearing any shoes. A search of the area led to the discovery of a pair of black boots, identified as belonging to the deceased. They were found outside in the rear yard underneath a window which was adjacent to the stairway in the deceased’s apartment building. The investigating team decided that the information about the boots being removed from the body and found in the rear yard should be kept private and not revealed to anyone outside the team.
Of major significance also was the discovery of a set of keys on the roof of the building where Sylvia Mondejar had been raped. Ms. Mondejar had found the keys in her clothing, which had been piled under her while she was being raped, and she turned them over to the police after she realized they did not belong to her. On the key ring were five keys, a link chain and a small finger-cleaning penknife.
When Charles Wright was picked up about 1:30 a.m. on June 1 for questioning, Sergeant Fahey began by making small talk and provided him with food. The conversation was steered to the conditions in the neighborhood and what had been happening in the elevators to women. He asked the defendant if he carried a knife, to which Wright replied, "if you call this a knife, I carry a knife,” and took from his pocket a key ring which held a small finger-cleaning penknife, five keys and a link chain. Fahey removed Wright from his *918 office, pulled out the set of keys that had been turned over by Sylvia Mondejar and compared them. The type of key ring, chain and knife were the same. Two or three of the keys were identical in cut. He immediately called Detective Rigby, who was in charge of the rape investigations, and informed him of the developments. Deputy Inspector Michael Clifford arrived at the precinct at about 5:00 a.m. During the time Wright was with Fahey, he took several naps and conversed with the sergeant about the rapes and homicides. He was mild, cooperative and very polite.
Inspector Clifford took over the questioning and Wright continued talking about the homicides. It was during his conversation with the inspector that he told about taking off Gertrude Mason’s boots. He did not know what to do with them. He was unable to get out through the roof so he went back to the elevator, pulled the body out so that her head jammed the door and then ran down the stairs carrying the boots. When he got to one of the stairway windows, he hurled the boots outside. The conversation with the inspector lasted about half an hour, at which time detectives began bringing in the women who had been assaulted to observe a lineup. Wright took several naps during breaks in the lineups, which concluded at about 9:00 a.m. Assistant District Attorney Mc-Ginley arrived at approximately 11:00 a.m. and took a formal statement from Charles Wright wherein he confessed in full detail to the murders of Gertrude Mason and Pauline Lubetsky. He stated that he had followed both with the intention of having sex and that when they struggled and screamed, he took out a six-inch knife and stabbed them.
McGinley asked him how he had been treated by the police, to which Wright responded that they had treated him all right. He seemed calm and anxious to talk to him. He did not restrict himself to yes or no answers but explained his answers further.
After the statement was taken, Wright was taken out for a re-enactment at the scene. He was driven by a team of detectives to Broadway near 161st Street and was told, "Take us to the homicide that you did last week.” He took them, without further ado, directly to Pauline Lubetsky’s apartment building.
At the persistent felony offender hearing the defendant called eight character witnesses, most of whom had worked with him at a publishing company where he had been em *919 ployed after his release from prison in September of 1977. All testified that he was a good worker, friendly, co-operative, had a good reputation for honesty and veracity, and had never caused anyone to feel any fear. It was also brought out that there were many times when a high-pressure situation would develop in the office due to the nature of the business and that, while everyone else in the office would at times lose his or her temper, Charles Wright not once lost his temper.
PRELIMINARY DETERMINATION AND FINDINGS OF FACT
If the confession to the two murders can be considered by me, I will adjudicate the defendant to be a persistent felony offender and sentence him to life imprisonment. Otherwise, I will sentence him to the ordinary maximum term of IVi to 15 years consecutive to the time owed. In my view the persistent felony offender statute should be utilized only in the most extreme cases, bearing in mind that a prior predicate felony will substantially increase punishment automatically. Only when extraordinary facts are involved should the prior felonies be again utilized to further add to the sentence. Certainly a person should ordinarily not be sentenced to life imprisonment merely because he exercised his right to a trial rather than pleading guilty.
With respect to the instant case, before considering the abstract constitutional issue, a determination must be made both as to the voluntariness and the truthfulness of the confession. If a confession was coerced either psychologically or physically, or if the confession is not truthful, then it is, of course, inherently unreliable and should not be considered.
I find that the testimony of Sergeant Fahey and Judge McGinley (then Assistant District Attorney McGinley) is credible beyond a reasonable doubt, that the confession was truthful and voluntarily tendered, untainted by coercion, threats or pressure of any kind. Significantly, both the People’s witnesses and the defendant’s character witnesses testified to the calmness, coolness, and lack of temper by the defendant in pressure situations. I note that during the course of these proceedings the defendant has been articulate, unfailingly polite, intelligent and courteous. In fact, during these proceedings when the defendant fired his attorney despite the court’s admonition that no other attorney would be assigned, the defendant maintained his calm, cool and detached demeanor. His attorney, on the other hand, who had performed *920 outstanding service for him at hearings and at two trials, was visibly upset.
The issue remains, therefore, as to whether CPL 400.20 (subd 5), permitting the defendant’s history and character and the nature and circumstances of his criminal conduct to be established by any relevant evidence, "regardless of admissibility under the exclusionary rules of evidence,” is constitutional. (Emphasis supplied.)
SENTENCING DISCRETION AND EXCLUSIONARY RULE
As a general rule, a Sentencing Judge may exercise broad discretion in the sources and types of evidence used to assist him in deciding upon an appropriate sentence (Williams v New York, 337 US 241; United States v Tucker, 404 US 443). In order for a court to impose a proper sentence, a broad scope of inquiry into the life of the defendant is essential (United States v Grayson, 438 US 41; Gregg v United States, 394 US 489).
A presentence report is made available to the Judge as an aid to his determination and contains information regarding the commission of the offense, defendant’s history of delinquency and criminality, defendant’s social history, employment history, family situation, economic status, education, personal habits, and any other relevant information (CPL 390.30, subd 1).
Courts may consider as evidence of a defendant’s history not only prior offenses for which defendant was convicted, but even offenses for which he has not been convicted (Williams v New York, supra; Ann. 96 ALR2d 768).
Nor is the court limited to consideration of material contained in the probation report. A court may also take its own observations into account. Consideration may be given to the defendant’s demeanor and the evidence heard at trial (Chaffin v Stynchcombe, 412 US 17), including the defendant’s false testimony (United States v Grayson, supra).
The most recent United States Supreme Court opinion on this issue reaffirmed the principle of broad sentencing discretion and asserted that a defendant’s refusal to aid in a government investigation could be considered by the Judge in imposing sentence (Roberts v United States, 445 US 552).
There are, however, due process limitations to the rule, and *921 a sentence imposed on the basis of "misinformation of constitutional magnitude” is reversible error (United States v Tucker, supra, p 447).
A sentence will be reconsidered where the original sentence was imposed on the basis of an inaccurate criminal record (Townsend v Burke, 334 US 736; United States v Malcolm, 432 F2d 809); where the sentence was based on the misapprehension that defendant had tried to fix a case and tried other ruses to avoid jail (United States v Stein, 544 F2d 96); where the sentence was based on uncorroborated assertions that the defendant was a large scale drug dealer (United States v Weston, 448 F2d 626); and where the sentence on one count may have been influenced by invalid convictions on the other two counts (United States v Mapp, 476 F2d 67).
However, the "mere fact that an invalid conviction was obtained does not immunize the facts underlying this conviction from consideration by the sentencing judge” (United States v Atkins, 480 F2d 1223, 1224). In that case, since the court was aware that the defendant’s murder conviction had been reversed, he was entitled to consider the facts underlying the conviction and accord them whatever weight they deserved.
In brief, therefore, there is a due process right to be sentenced on reliable and accurate information. A due process violation occurs when a court is unaware of the unconstitutionality of a prior conviction or is otherwise misinformed as to material facts in a defendant’s criminal history.
Does the defendant, then, have a right to the exclusion of evidence because it was obtained without compliance with Miranda even though it may be accurate , and reliable and would greatly aid the Judge’s determination of an appropriate sentence?
This is a thorny and complex issue, which has not yet been ruled upon in New York State.
While the exclusionary rule is not merely a judicially created rule of evidence but is part of the constitutional right to be free from unreasonable searches and seizures (Mapp v Ohio, 367 US 643) and the right against self incrimination (Miranda v Arizona, 384 US 436, supra), nevertheless, its application is not unlimited. A statement inadmissible against defendant in the prosecution’s case in chief, because of a Miranda violation, may, if its trustworthiness satisfies legal standards, be used to impeach the defendant’s credibility *922 (Harris v New York, 401 US 222). Illegally seized evidence is admissible in a Grand Jury proceeding (People v McGrath, 46 NY2d 12; United States v Calandra, 414 US 338), and in a school disciplinary proceeding (Morale v Grigel, 422 F Supp 988). Illegally obtained evidence that the insured had set fire to his own house was admissible in insured’s suit to recover the proceeds of the fire policy (Honeycutt v Aetna Ins. Co., 510 F2d 340). Evidence of cash and wagering records illegally seized by a State government was admissible in a Federal tax proceeding (United States v Janis, 428 US 433).
To determine the applicability of the exclusionary rule to a particular proceeding, a balancing test is employed, i.e., whether or not the deterrent effect on unlawful police conduct outweighs the harm caused to the truth-finding process by the exclusion of such evidence (United States v Lee, 540 F2d 1205).
Generally, those jurisdictions ruling on the issue of the admissibility at sentencing of illegally seized physical evidence have decided that the harm in prohibiting its admission far outweighs the minimal deterrent effect (United States v Schipani, 435 F2d 26, cert den 401 US 983; United States v Lee, supra; United States v Vandemark, 522 F2d 1019; State v Benge, 110 Ariz 473; State v Banks, 157 NJ Super 442; State v Wells, 265 NW2d 239 [ND]).
The courts warn, however, that should the evidénce be shown to be unreliable or have been gathered for the specific purpose of influencing the sentence, then the exclusionary rule would apply (United States v Schipani, supra; United States v Lee, supra).
The leading case on this point is Verdugo v United States (402 F2d 599, cert den 402 US 961), where Government agents conducted an outrageously illegal search after they had already obtained sufficient evidence for a conviction. The sole purpose of the search was to gather additional evidence to show that the defendant was involved in large scale narcotics traffic and was not just a seller in a single small transaction, so that he would receive a much higher sentence. If the exclusionary rule were not applied, the incentive for similar conduct in the future would have been substantial.
With regard to the admissibility of illegally obtained confessions, scant case law exists. In an early case, Armpriester v United States (256 F2d 294), the court rejected defendant’s *923 contention that he had been prejudiced by the admission at sentencing of a statement obtained in violation of subdivision (a) of rule 5 of the Federal Rules of Criminal Procedure (in US Code, tit 18, Appendix). On the other hand, the Third Circuit has held that a constitutionally invalid confession, not admissible at trial, could not be used at sentencing (United States ex rel. Rivers v Myers, 384 F2d 737; United States ex rel. Brown v Rundle, 417 F2d 282). However, these holdings were based upon the fact that there were serious doubts about the voluntariness and accuracy of the confession.
Of particular interest is the case of State v Jones (110 Ariz 546, cert den 419 US 1004) where the court sentenced defendant to 99 to 100 years for first degree rape and 9 to 15 years for burglary. It was held that it was not error to utilize an illegal confession, which was only one of many factors justifying such a lengthy sentence, including the seriousness of the crimes, results of a polygraph test concerning an unrelated rape, similarity of defendant’s modus operandi to that of other offenses committed within the same geographical area, and the prior plea of guilty to two separate burglary charges.
Thus it is fairly clear that in most Federal courts and in most States a "sentencing exception to the exclusionary rule” has evolved. Absent bad faith (see Verdugo v United States, supra), the importance of the information to the sentencing process combined with the marginal deterrent effect the exclusion would have on police conduct justifies the use in a sentencing proceeding of reliable evidence which would be inadmissible at trial. (See Strachan, Self-Incrimination, Immunity and Watergate, 56 Tex L Rev, 791, 829. [A different situation arises, however, when the Fifth Amendment violation involves immunized testimony. See United States v Wilson, 488 F2d 1231; United States v Patrick, 542 F2d 381; New Jersey v Portash, 440 US 450.)
PICCARILLO
Whatever the rule may be in other States and in the Federal courts, the defendant contends that People ex rel. Piccarillo v New York State Bd. of Parole (48 NY2d 76) is a bar to the admissibility of his confession. In Piccarillo, the New York Court of Appeals applied the exclusionary rule to a parole revocation proceeding to bar the use of evidence ob *924 tained in violation of defendant’s Fourth Amendment rights,[1] and which had been suppressed in a criminal proceeding.
Holding that the parolee’s right to be free from unreasonable searches and seizures under both the Federal and State Constitutions had been violated, Judge Jasen, speaking for the court, stated (supra, p 83): "To draw a distinction between criminal actions and parole revocation hearings * * * would, in our opinion, serve only to undermine the effectiveness of the rule as a deterrent.”
The Piccarillo court (supra, pp 82-83) was appropriately concerned that deterrence " 'would not be served if the illegal official activity could be used, despite unavailability in criminal proceedings, to effect parallel sanctions * * * in an administrative proceeding.’ ”
In effect, the direct nexus between the illegally seized evidence and the parole revocation hearing made that hearing nothing less than a criminal trial.
For the court to have ruled otherwise would have permitted searches of parolees without any justification. If contraband were found, parole could then be revoked. The Court of Appeals would not give such a license to the police, since, in their opinion, the primary purpose of the exclusionary rule, deterrence of illegal police conduct, would have been nullified.
The situation here is entirely inapposite. Guilt has already been established by jury verdict and the duty of the court is to determine the most fitting punishment. As the Circuit Court of Appeals stated in United States v Schipani (435 F2d 26, 28, supra), "applying the exclusionary rule for a second time at sentencing after having already applied it * * * would not add in any significant way to the deterrent effect of the rule.”[2]
Indeed, if we were to expand Piccarillo to include the sentencing process, then no probation officer could obtain information from a defendant in custody without the presence *925 of an attorney, if that interview elicits material which might cause the Judge to increase the sentence.
The deterrent effect of excluding the confession would be minimal. The officers who obtained the confession 15 years ago were sufficiently deterred when they were unable to use the evidence for a conviction on the murder charges. While it is conceivable that the police may attempt illegally to gather a large body of evidence against someone so that it could be used later for sentencing purposes, no such situation exists in this case.
Exclusion of the evidence would harm the sentencing process. "The purpose of the [persistent felony offender] statute is to allow the court to use a sentence that includes extended incarceration and lifetime supervision for persons who persist in committing serious crimes after having been subjected to repeated terms of imprisonment” (Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 70.10, p 220). A Judge has the responsibility to protect society from dangerous individuals as well as a responsibility to the defendant to deal with him fairly and justly. In order to fulfill both duties, a sentencing court must be provided with all relevant information that exists. To exclude evidence that is otherwise reliable and accurate would seriously impair the judicial process.
Statutes are presumed valid and constitutional, and there is a burden on the defendant to establish their unconstitutionality beyond a reasonable doubt (People v Epton, 19 NY2d 496).
A statute must be construed in favor of its constitutionality and in such a matter as to uphold its constitutionality (McKinney’s Cons Laws of NY, Book 1, Statutes, § 150 et seq.), particularly when a lower court is making the initial determination. While the issue is not free from some doubt under Piccarillo, the defendant has failed to meet his burden here. I hold, therefore, that in the circumstances of this case CPL 400.20 (subd 5), permitting consideration of all relevant evidence regardless of its admissibility under the exclusionary rule, is constitutional.
Where there is no evidence that an invalid confession was obtained for the purpose of increasing a sentence, where the court is aware of the underlying violation, and where the reliability of the confession is conclusively established according to legal standards, the confession may be considered as evidence in a sentencing proceeding.
*926 Applying these standards to the facts of this case, I find that the confession is admissible. There is no evidence that the confession was obtained for sentencing purposes. The confession is reliable and was voluntarily made despite the Miranda violation. The fact that the defendant’s keys were found at the scene of one of the crimes and that the defendant knew about and explained the absence of the boots on one of the victims (a fact which was kept secret from the press and general public), the fact that he fit the suspect’s description, the fact that he was treated well during the course of the questioning and not coerced in any way and was warned that he did not have to say anything — all demonstrate conclusively that the confession is reliable.[3]
The final question that remains is whether the defendant should be sentenced as a persistent felony offender. The defendant has two prior convictions, one for assault and one for rape. The additional evidence clearly shows that the defendant is a dangerous person who cannot be trusted to function normally in society. His crimes are all of the same nature, assaults on innocent women, leading to rape and murder. After being jailed for 12 years, he committed the present offense — the same kind of offense in the same geographical area as in 1965.
Despite his obvious intelligence and calm demeanor, there is a demon within the psyche of Charles Wright which neither extended incarceration nor a period of liberty has exorcised.
Under all these facts, renewed extended incarceration is warranted to best serve the public interest. Accordingly, Charles Wright is adjudged a persistent felony offender and is sentenced to life imprisonment, with a minimum of 15 years consecutive to time owed.

. New York is at odds with the majority of jurisdictions on this point. (See United States ex rel. Sperling v Fitzpatrick, 426 F2d 1161 [CCA 2d]; United States v Hill, 447 F2d 817 [CCA 7th]; United States v Brown, 488 F2d 94 [CCA 5th]; United States v Farmer, 512 F2d 160 [CCA 6th]; United States v Vandemark, 522 F2d 1019, supra [CCA 9th]; State v Caron, 334 AD2d 495 [Me]; Commonwealth v Kates, 452 Pa 102; State v Spratt, — RI —, 386 A2d 1094; State v Thorsness, 165 Mont 321; Matter of Martinez, 1 Cal 3d 641; Stone v Shea, 113 NH 174.)

. See Illegally Obtained Evidence Suppressed at Trial May Be Used in Sentencing Where Evidence Is Reliable and Not Gathered to Influence the Sentencing Judge, 71 Col L Rev 1102.

. There were some minor discrepancies, which I find insignificant.