OPINION OF THE COURT
Peggy C. Davis, J.
This case raises the question whether the court may rely at the dispositional phase of a juvenile delinquency proceeding, upon a confession obtained in violation of rules created to safeguard the right to counsel guaranteed by the Sixth and Fourteenth Amendments of the Federal Constitution and section 6 of article I of the State Constitution.
THE FACTS
At the fact finding it was established that the respondent had committed a designated felony in that he participated in a robbery during which the victim was injured. The court must therefore determine whether a restrictive placement is required. (Family Ct Act, § 753-a.) The attorneys appearing in support of the petition urge such a placement and base their position in part upon respon *897 dent’s tape recorded confession to unrelated, actual and attempted burglaries (the burglary statement). A petition alleging burglary was dismissed by another court as a result of its suppression of the burglary statement. In that proceeding, it was held that respondent was arrested upon probable cause; that the requirements of section 724 of the Family Court Act (concerning interrogation of juveniles) were met; that respondent knew and stated that he would waive his rights to remain silent and consult counsel; but that his waiver of counsel was invalid since the police officer knew or should have known that he was represented in another matter by an attorney and that attorney was not present at the time of the waiver. Those findings were accepted by this court.[1] Moreover, this court has independently determined that the statement was not the product of abuse, intimidation or coercion and that it is reliable.[2]
THE CONSTITUTIONAL QUESTION
Neither the Supreme Court of the United States nor the Court of Appeals of the State of New York has decided whether the exclusionary rule extends to shield unlawfully obtained but apparently reliable confessions from consideration at a criminal sentencing or delinquency disposition.[3]
To support the argument that the court is free to consider such evidence, petitioners rely upon Harris v New York (401 US 222) and Matter of Kevin J. (108 Misc 2d 1033). Their position has more direct support. Harris involved the use, for impeachment purposes at trial, of statements taken in violation of rules designed to protect and implement the Sixth Amendment right to counsel, and *898 Kevin J. involved a confession lawfully obtained. However, the Second Circuit has held in United States v Schipani (435 F2d 26)[4] that the Federal Constitution poses no bar to consideration at sentencing of unlawfully obtained but reliable evidence and, in People v Wright (104 Misc 2d 911), acting Justice Lang held similarly within the constraints of both the New York and the Federal Constitutions. The clarity and persuasiveness of Justice Lang’s analysis of applicable State and Federal principles are such that this court fully adopts its conclusions.
It is arguable, however, that a different result is required in the delinquency context. The Wright court acted under a statute which explicitly authorized receipt of relevant data “regardless of [its] admissibility under the exclusionary rules of evidence” (CPL 400.20, subd 5);[5] the Family Court Act, by contrast, provides simply that at a delinquency disposition the court may consider “only evidence that is material and relevant.”[6] It . might be said that inclusion of an express authorization in CPL 400.20 (subd 5) suggests a legislative presumption that the authorized evidence would otherwise be excluded at sentencing. However, the court is convinced by the breadth of the language of the Family Court Act that the Legislature intended no limitation upon the opportunity to consider evidence relevant to disposition. Indeed, it appears that evidence excludable at trial might be considered in adult sentencing proceedings without the authorization provided in CPL 400.20 (subd 5)[7] and that the language of that section was designed not to expand the court’s authority but to call the constitutional question.
A second distinguishing factor might also call for a different result in this context. A delinquency disposition serves a somewhat different function than a criminal sentencing. If the court does not find at the dispositional phase *899 that the respondent is in need of supervision, treatment, or confinement, the petition must be dismissed. (Family Ct Act, § 712, subds [a], [f], [g]; §§ 731, 752.) In view of the need to establish at the dispositional phase an element of the delinquency (a need for supervision, treatment or confinement), it might be argued that the use at disposition of tainted evidence is so akin to use of such evidence at trial that it should not be permitted. However, the over-all nature of the dispositional hearing is such that the court may not exclude relevant, reliable evidence without compromising its broader function. Upon finding a need for supervision, treatment or confinement, the delinquency court is required to tailor its disposition to meet these needs with as little restriction upon liberty as can provide appropriate safeguards for public safety. The combined determination of the need for and proper scope of remedial measures requires full consideration of the background and psychology of the respondent and the social and family context within which he has functioned. In this case, for example, the court received reports and testimony from a probation investigator, a psychologist and a psychiatrist, each of whom had some information (or misinformation) concerning the contents of respondent’s burglary statement.[8] Had the court been constrained to remain ignorant of this evidence,, it could not have evaluated the reports and recommendations of those experts and investigators. One must fear that with such a handicap the court would either abdicate the judicial function to clinicians and investigators or risk a disposition that fails to address the needs of the child and his community. On balance then, the court finds the existence of a jurisdictional hurdle at the dispositional phase insignificant in view of the complexity and over-all purpose of the proceeding and the need for a fully informed, judicial determination of the appropriate disposition.
This is not said to belittle the exclusionary rule in the delinquency context. In the juvenile system as well as in the adult system the exclusionary rule is applicable where *900 its deterrent impact is greatest: “in a * * * prosecution of a charge substantively related to the acquired evidence” (People v McGrath, 46 NY2d 12, 31). When an investigative arm of this State violates constitutional safeguards to acquire evidence of unlawful conduct, it is precluded from relying upon that evidence to prove the unlawful conduct in a delinquency proceeding; a criminal trial; a parole revocation hearing (People ex rel. Piccarillo v New York State Bd. of Parole, 48 NY2d 76); a public housing eviction proceeding (Matter of Tejada v Christian, 71 AD2d 527); a proceeding before the State Liquor Authority (Matter of Finn’s Liq. Shop v State Liq. Auth., 24 NY2d 647) or in any similar proceeding. This limitation upon the use of tainted evidence serves to discourage official disregard for constitutional rights. And, although the concept of judicial integrity has rarely been mentioned in recent cases, the limitation serves also to assure that violations of the constitutional rights of citizens shall “find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights” (Weeks v United States, 232 US 383, 392).
Judge Lang’s thorough, recent review of relevant case law demonstrated, however, that “in most Federal courts and in most States a ‘sentencing exception to the exclusionary rule’ has evolved. Absent bad faith * * * the importance of the information to the sentencing process combined with the marginal deterrent effect the [second] exclusion would have on police conduct justifies the use in a sentencing proceeding of reliable evidence which would be inadmissible at trial.”[9] This court agrees and holds that when it has been established, without resort to tainted evidence, that a child has engaged in unlawful conduct which serves as the predicate for a delinquency finding, the court’s need to fully explore all evidence relevant to the need and proper form of supervision, treatment or confinement outweighs any disadvantage associated with the margin of the court’s influence upon investigative methods *901 and requires consideration of all relevant, reliable evidence obtained in good faith. The court is also persuaded that notions of judicial integrity should not be abandoned out of fear that they are limitless. However, in view of (1) the scrupulousness of judicial insistence that the predicate for State intervention be proved only by untainted evidence; (2) the need for full disclosure in fashioning and limiting any State intervention in the life of a citizen and (3) the requirement that any evidence considered by the court be reliable and obtained in good faith, the “sentencing exception to the exclusionary rule” is consistent with the obligations of the judiciary to maintain respect for constitutional principles.
THE NEED FOR A RESTRICTIVE PLACEMENT
Petitioners have urged that respondent be placed restrictively. If he were, his placement would be with the Division for Youth for an initial period of three years; he would be confined to a secure facility[10] for an initial period of at least six months; confinement in a secure residential facility would be required for an additional period of at least six months; and placement could be extended until his twenty-first birthday. (Family Ct Act, § 753-a, subd 4.)
If respondent is not placed restrictively, he will be placed, on consent, in a Division for Youth Title III facil *902 ity[11] for up to 18 months. The placement could be extended until his eighteenth birthday.[12] (Family Ct Act, § 756.) This is the most serious disposition available to the court in the absence of a finding for a need for restrictive placement.
In considering the need for restrictive placement, the court must weigh the needs, interests, records and background of the respondents; “the nature and circumstances of the offense, including whether any injury involved was inflicted by the respondent or another participant”, and “the age and physical condition of the victim”; and “the need for protection of the community”. (Family Ct Act, § 753-a, subd 2.)
Upon the facts of this case, in particular, the fact that respondent did not injure or attempt to injure the victim,[13] *903 upon consideration of the court’s duty to safeguard the public, and in view of the requirement that the court select the least restrictive placement alternative consistent with the needs of the respondent and the community,[14] the court finds that respondent must be placed in a Title III facility. The Division for Youth has however, been given authorization to transfer respondent to a secure facility without further hearing if such placement is warranted by his behavior during the first 60 days of placement.[15]
The Division for Youth is directed to submit, every six months, to the attention of Judge Davis, reports concerning respondent’s adjustment and treatment.[16]

. People v Wright (104 Misc 2d 911, 914).

. An unrecorded portion of respondent’s statement was also considered and found to be indistinguishable in terms of admissibility and reliability.

. The coerced confession, excludable upon due process grounds which predate the exclusionary rule (see Davis v North Carolina, 384 US 737), and bearing an inherent risk of unreliability, is distinguishable and unworthy of consideration in determining either guilt or punishment (People v Jackson, 20 NY2d 440,445-446). Although the language of Jackson (p 455) suggests a willingness on the part of the Court of Appeals to allow consideration at sentencing of a confession which was obtained unlawfully but not involuntarily, (a) the question was not before it; and (b) the capital sentencing scheme under which the case arose explicitly provided that evidence might be ‘“received regardless of its admissibility under the exclusionary rules of evidence.’ ”

. (See, also, Note, Illegally Obtained Evidence Suppressed at Trial May Be Used in Sentencing Where Evidence Is Reliable and Not Gathered to Influence the Sentencing Judge, 71 Col L Rev 1102).

. The capital sentencing scheme considered by the Court of Appeals in People v Jackson (20 NY2d 440) was similar in this respect. (See p 897, n 3, supra.)

. Family Ct Act, § 745, subd (a).

. See CPL 390.30.

. The transmission of such information to clinic and probation personnel is routine, inevitable, and, so long as the evidence is reliable, desirable.

. People v Wright (104 Misc 2d 911, 923).

. A “secure facility” is “characterized by physically restricting construction, hardware and procedures”. (Executive Law, § 515-a.)
An informational pamphlet prepared by the-New York State Division for Youth contains the following description:
“In order to provide for appropriate security, secure centers have a distinctive secure physical capability. Access to and from secure centers is always under the strict control of the staff. The center is either a single building or a small cluster of buildings in very close proximity to each other, and surrounded by a security fence. Security centers are characterized by individual rooms for each youth. These rooms are in most cases locked at night. Most secure centers are located in non-urban areas.
“In addition to the physical nature, secure centers are also characterized by the special staffing patterns.
“Because virtually all services must be provided on grounds, secure staff patterns include academic, vocational, counseling, recreational, and medical staff to meet the needs of the residents. In addition, appropriate child.care staffing is required to not only control the movement and behavior of youth within the program, but also to provide intensive staff support and supervision of youth in support of the program goals *** Because of the serious nature of the offenses which the youth in secure centers have committed, the average length of stay in the centers is the highest in DFY * * * [an] average of 12 months.” (New York State Division For Youth, Rehabilitative Services, Program Level System: Summary 3 [1980].)

. “[A Title III facility is] characterized by a less secure nature than that which exists in [a secure facility, and] represents the widest variety within any of the levels within DFY. Facilities in this level range from 120 bed training schools to 20 bed centers. In most cases, these facilities are located in rural areas. In those cases where [Title III] facilities are located within urban areas, the buildings are of a much bigger security capability than those facilities located in rural areas * * *
“Virtually all services in [Title III] facilities must be provided on grounds, and thus, staffing patterns include appropriate academic, child care, vocational, recreational, counseling and medical resources to provide these services.
“Included within [Title III] facilities is a sub-group of ‘closed resources.’ Closed resources are those which provide a more intensive level of staffing within the facility, for those youth who cannot operate in the more open setting * * * Youth [are] placed in these closed settings * * * in order to prevent AWOLS and other inappropriate behavior, most notably, physical aggression. It is assumed that on the average, the youth will remain in [Title III] facilities for approximately 12 months and will in many cases, require transfer to less secure resources as transitional steps to the community.” (New York State Division For Youth, Rehabilitative Services, Program Level System: Summary 3-4 [1980].)

. With respondent’s consent, the placement could extend to his twenty-first birthday.

. Despite the fact that psychological testing did reveal in the judgment of the examining psychologist, significant aggression, respondent is not known to have committed any illegal act of violence. See Megargee, Prediction of Violence with Psychological Tests, 2 Current Topics in Clinical And Community Psychology 97 (1970) for an analysis of the reliability of psychological tests as a tool for predicting violence. For discussions of the ability of mental health professionals to predict violence, see Stone, Mental Health And Law: A System In Transition, 25-40 (1975). Ennis & Litwack, Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, 62 Cal L Rev 693; Dershowitz, The Law of Dangerousness: Some Fictions about Predictions, 23 J Legal Educ 24; Wenk, Robinson & Smith, Can Violence Be Predicted?, 18 Crime & Delinquency 393; Morris, Psychiatry and the Dangerous Criminal, 41 So Cal L Rev 514. For discussions of the reliability and usefulness of diagnostic tests, see Rappaport, Schafer & Gill, Diagnostic Psychological Testing (1979); Rabin, Assessment With Projective Techniques (1981).

. Matter of Andre L. (64 AD2d 479); Matter of Anthony N. (106 Misc 2d 213); Matter of Norman R. (109 Misc 2d 5).

. (Family Ct Act, § 756, subd [a], par [iii], cl [1]). There has been no assertion that such authorization is impermissible in view of placement with a class of authorized agency.

. The court is grateful for the excellent research assistance of Robert Apfel, Esq., Michael Ecker and Sue Ann Hoahng.