OPINION OF THE COURT
Daniel D. Leddy, Jr., J.
By this motion, initiated by order to show cause, the respondent in this juvenile delinquency proceeding, Anthony N., seeks an order adjudging the Commissioner of Juvenile Justice to be in contempt of court and punishing him therefore.
On March 3, 1980, Anthony was placed on probation for two years after having admitted to committing an act which would constitute attempted criminal possession of a weapon in the third degree (Penal Law, §§ 110.00, 265.02). This was the only petition ever filed against the boy and the court carefully formulated the conditions of probation to meet his special needs.
Unfortunately, Anthony violated his probation twice, the second time resulting in a revocation of that status and a parole pending exploration of placement.
On May 6, 1980, Anthony admitted to a charge that he had violated the terms of his parole status. Thereupon, parole was revoked and he was remanded to the Commis *215 sioner of Juvenile Justice for nonsecure detention. Coincidentally, both the counsel to the commissioner and the ombudsman of the Department of Juvenile Justice were present in the courtroom at the time.
To effect its order, the court signed a written remand (form C-23b) committing the boy to the custody of the commissioner. The words “Non-Secure Detention” were prominently placed on the paper and underlined twice by the court. At the same time, the court made the following entry on its own indorsement sheet “RCJJ (N.S.D.)”.
In addressing the boy on the record, and in the presence of the commissioner’s counsel, the court said: “Anthony, I’m going to send you tonight to a group home.” In furtherance of the stated objective, the court said: “I’ll remand Anthony to the Commissioner of Juvenile Justice for non-secure detention.”
Despite the court’s specific direction, Anthony was held in the Spofford Detention Center, a secure facility, for nine days. When, quite fortuitously, the court learned of his situation, it ordered him produced. The boy was returned to court with his wrist in a splint, claiming he had been physically abused by other residents of the facility.
On the return date of this order to show cause, the commissioner relied solely on the argument of counsel, choosing not to offer any sworn testimony either by written papers or orally.
His attorneys argued that the decision to place Anthony in Spofford, rather than a nonsecure facility, was a proper exercise of the discretion of the commissioner and that, in such matters, his discretion is controlling. They explained that the boy had been evaluated by the department’s court assessment unit and that his detention in Spofford “was really taken as a result of the authority and guidelines of what they deemed was in the best interest of the child.” The attorneys maintained that the court’s reference to non-secure detention was merely precatory and not binding upon the commissioner.
It should be emphasized at the outset that this is not a *216 situation where the court, having determined the degree of appropriate confinement, sought to specify the exact place of confinement within that degree. For here, there is a very substantial difference between secure and nonsecure detention facilities. In defining both terms, the Family Court Act clearly sets forth as determinative the presence or absence of “physically restricting construction, hardware and procedures” (Family Ct Act, § 712, subds [d], [e]). It is obvious that this distinction is of critical importance since it relates directly to the degree of freedom lost.
The power of the Family Court to direct detention is set forth in subdivision (a) of section 739 of the Family Court Act. This statute provides in part: “After the filing of a petition under section seven hundred thirty-one or seven hundred thirty-two, the court in its discretion may release the respondent or direct his detention.”
The commissioner would read this language as precluding the court from specifying the type of detention to be employed. That such was not the intent of the Legislature is clear. Subdivision 2 of section 720 of the Family Court Act provides: “The detention of a child under ten years of age in a secure detention facility shall not be directed under any of the provisions of this article.” Since the entity that “directs” detention under article 7 of the Family Court Act is “the court”(Family Ct Act, § 739, subd [a]), it is obvious that subdivision 2 of section 720 was meant to preclude the court from directing thn-detent-ion-oLa-child under 10 in a “secure detention facility”. The import of subdivision 2 of section 720 is apparent. The court may direct either secure or nonsecure detention for children over 10 but only nonsecure for those under 10. Such an interpretation is consistent with the principle of statutory construction contained in the maxim “expressio unius est exclusio alterius”. (See McKinney’s Cons Laws of NY, Book 1, Statutes, § 240.)
To adopt the commissioner’s interpretation would render subdivision 2 of section 720 utterly meaningless since the court would lack the authority to direct secure detention for any child regardless of age. Such an objectionable consequence is to be avoided. (See McKinney’s Cons Laws of NY, Book 1, Statutes § 141.)
*217 Concededly, even nonsecure detention affects the freedom of the child to some degree. As the Court of Appeals concluded in People ex rel. Wayburn v Schupf (39 NY2d 682, 686-687) “any pretrial detention impinges on the right to liberty, a fundamental right that is recognized in the constitutional sense as carrying a preferred status and so is entitled to special protection.” And yet, how much greater is the deprivation of that freedom when the child is locked up in a secure facility as opposed to being cared for in a group home? It is, therefore, hardly surprising that the Legislature entrusted the care of that “preferred status” to the judiciary rather than a municipal administrative agency.
In fact, the Legislative has specifically rejected attempts to limit the discretion of the court in safeguarding the interests of the child. The history of section 756 of the Family Court Act is a case in point. Paragraph (ii) of subdivision (a) of that section provides in part: “Where the child is placed with the commissioner of social services, the court may direct the commissioner to place the child with an authorized agency or class of authorized agencies.” In analyzing the evolution of that section, the McKinney’s Practice Commentaries (McKinney’s Cons Laws of NY, Book 29A, Supplementary Pamphlet 1976-1979, Family Ct Act, § 756, p 287) state: “In 1975, a proposal to simply eliminate the option of placement directly with an authorized agency died in committee. The objection was that the court should retain the power to determine where the child is ultimately placed and not have to yield that power to a Social Services commissioner. The 1976 amendment contains safeguards to preserve the court’s power.” Thus, the Legislature retained the court’s power to specify the particular agency within a nonsecure status that would care for the child. Against this background, it strains credulity to suggest that the Legislature intended to give agencies such as the Department of Juvenile Justice the power to lock a child in a secure facility when the court directs otherwise.
The extent of permissible agency discretion may be measured by analyzing section 23 of the Correction Law *218 and judicial reaction thereto. That statute provides in relevant part: “The commissioner of correction shall have the power to transfer inmates from one correctional facility to another.” While the Legislature did not enact a specific qualification on the right to transfer, it is significant that the courts have. Accordingly, it is well established that any such transfer must be to a facility offering the same degree of confinement contemplated by the committing court. In point is the language of People v Jiminez (71 Misc 2d 867, 869) wherein the court declared: “Any change in the place of imprisonment which serves to deprive the prisoner of his right to that type of incarceration deemed to be appropriate by the sentencing Judge is void.” The United States Supreme Court has made it clear that the discretion of the administrative agency is limited to those instances where “the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution” (Montanye v Haymes, 427 US 236, 242; see, also, People ex rel. Sata v Martin, 289 NY 471).
While these cases deal with postconviction sentencing, their rationale applies to detention cases with even greater force since, in the latter instances, many of those detained have not, as yet, been found to have violated any law.
The case of Matter of Terrance C. (45 AD2d 825), cited by the commissioner is perfectly consistent with these principles. In Terrance C., the Appellate Division held that the New York State Division for Youth had the ultimate responsibility for determining whether a release of the child would be in his best interest and that judicial language seeking to limit that right was precatory. The case is clearly distinguishable since under section 523 of the Executive Law, cited by the Appellate Division, there is unmistakable statutory authority in very specific language granting the Division for Youth the power it claimed. There is no such statutory authorization for the position taken by the commissioner here.
The local law which created the Department of Juvenile Justice provides that the regulations established by the commissioner for the operation of secure and nonsecure deten *219 ti on facilities must not be inconsistent with State law. (Local Laws, 1979, No. 24, ch 28, § 677, subd [c].) And from the foregoing, it is clear that, under State law, the power to direct the type of detention facility for a remanded child belongs to the State Family Court and not the New York City Commissioner of Juvenile Justice.
The moving papers fail to specify whether the adjudication of contempt sought is criminal or civil. (Judiciary Law, §§ 750, 753.) A clear indication of the appropriate nature of the proceeding may be obtained by examining the reason for which resort to the court’s contempt power is undertaken. In Carmody-Wait 2d (NY Prac, vol 22, § 140.2, p 466) it is observed that “Where the primary purpose is to preserve the court’s authority, and to punish for disobedience of its order, the contempt is criminal. Where, however, the primary purpose is to provide á remedy for an injured suitor, and to coerce compliance with an order, the contempt is civil.” (See, also, Matter of Springer, 238 App Div 305; People ex rel. Munsell v Court of Oyer & Terminer of County of N. Y., 101 NY 245.)
Of course, the distinction between civil and criminal contempt is not always readily apparent and there may well be instances where the same act constitutes both civil and criminal contempt. (King v Barnes, 113 NY 476; 9 NY Jur, Contempt, § 1.) Such is the case here. The judiciary has no function more critical than the safeguarding of our citizens’ constitutional freedoms. Similarly, no affront to the court’s authority could be more severe than disobedience to its exercise of that function.
 It is clear, therefore, that the moving papers properly state a cause of action for criminal contempt. Moreover, when, as a party to the delinquency proceeding, Anthony was remanded for nonsecure detention, he was entitled to the benefit of that status. When he was deprived of that status, he suffered an injury amenable to redress by the court’s civil contempt power.
However, precisely because a civil contempt proceeding is basically remedial, it is inappropriate at this late stage. Anthony was released from Spofford well before the initia *220 tian of this motion. Thus, a finding of civil contempt will not now enforce his right to nonsecure detention. To the extent that he has been aggrieved by his confinement in Spofford, he may, if he is so inclined, pursue a plenary civil action for damages.
Given the totality of the circumstances in this case, including the magnitude of the alleged affront to its power, the court will construe the moving papers as an application to hold the commissioner in criminal contempt.
It is well established that in a criminal contempt proceeding, proof of guilt must be established beyond a reasonable doubt. (Michaelson v United States, 266 US 42; Yorktown Cent. School Dist. v Yorktown Congress of Teachers, 42 AD2d 422.)
Furthermore, there must be proof of willfulness and an intent to defy the dignity and authority of the court. (Matter of Sheridan v Kennedy, 12 AD2d 332; Matter of Rotwein [Goodman], 291 NY 116.)
In evaluating the arguments of the commissioner’s attorneys, two basic contentions are advanced. First, it is urged that the court lacked the authority to order nonsecure detention and that the mandate issue was, therefore, invalid. As has been already established, the court does, indeed, have the right to order the type of detention for a remanded child. Nevertheless, even assuming, arguendo, that the court order were invalid, the commissioner may not advance that fact as a defense to this criminal contempt proceeding. As the Appellate Division emphasized in Mount Sinai Hosp. v Davis (8 AD2d 361, 363) : “Finally, it is elemental that a contemnor may not question the validity of the order violated. (Daly v. Amberg, 126 N. Y. 490.) ”
The second argument made on behalf of the commissioner is more substantial. He alleges an honest, good faith belief that the court’s language was precatory. In support of this assumption, he points out that it has been the modus operandi of his department to consider a judicial specification of the type of detention on the remand paper (C-23b) as embodying a recommendation from the court. He further argues that other Judges have acquiesced in this procedure *221 and, accordingly, he construed this court’s reference to non-secure detention as mere precatory language.
A finding of criminal contempt is an extremely serious matter and this court is not anxious to conclude that a public servant, sworn to uphold the law, has acted in defiance of it. After carefully reviewing the entire record in this case, the court finds that the facts established fall just short of proving criminal contempt beyond a reasonable doubt. The good faith defense advanced by the commissioner, through his able counsel, creates a reasonable doubt in the court’s mind that he acted willfully or with an intent to defy the authority of the court. (Matter of Sheridan v Kennedy, supra.) Accordingly, the motion to adjudge the commissioner to be in criminal contempt of court is denied.
Despite this decision, this court wants to emphasize how thoroughly alarmed it is at the attitude and conduct of the Department of Juvenile Justice. There is no constitutional privilege entitled to greater respect by government than a citizen’s personal liberty. And yet the commissioner, without any statutory authority, claimed for himself an awesome power over that constitutional privilege. And in doing so, the commissioner’s conduct has created a clear and present danger to the constitutional rights of the children of this city.
When this court remanded Anthony for nonsecure detention, it carefully considered the dual purposes of a juvenile delinquency proceeding and thus evaluated both the needs of the boy and the rights of the community to protection. Its decision to limit the extent of Anthony’s loss of freedom was deliberately formulated, consistent with the court’s obligation to order “the least restrictive confinement consonant with both purposes”. (Matter of Andre L., 64 AD2d 479, 481.) Nevertheless, the commissioner deprived this boy of his freedom to a degree totally beyond the contemplation of this court or the sanction of the law. In doing so, he also occasioned a grave constitutional wrong.
Even more upsetting is the fact that the commissioner’s counsel conceded “I cannot tell you that we misunderstood what it was you were intending to do in this instance.” Understanding the court’s intent, the failure of the Depart *222 ment of Juvenile Justice to inform the court of Anthony’s detention at Spofford was the height of irresponsibility, if not arrogance.
The detention facilities operated by the Department of Juvenile Justice, including Spofford, are certified by the New York State Division for Youth pursuant to section 510-a of the Executive Law. In fact, such certification is a sine qua non for their operation. Similarly, the Division for Youth may revoke a certification for good cause shown (Executive Law, § 510-a, subd 6, par [c]).
In light of the actions and attitudes of the Department of Juvenile Justice, a copy of this decision shall be forwarded to the Director of the New York State Division for Youth for whatever action he deems appropriate.