OPINION OF THE COURT
Elliott Wilk, J.
This action challenges defendants’ policy and practice of *173 denying Home Relief benefits, Medicaid and food stamps[1] to destitute homeless people who reside in emergency shelters. It began as a CPLR article 78 proceeding in which McKenzie Thrower sought to overturn respondents’ decision to deny him this relief.
Vincent Ogle moved (1) for leave to intervene as a party plaintiff; (2) to convert the proceeding to a plenary action pursuant to CPLR 103 and for leave to file an amended complaint; (3) for a preliminary injunction; and (4) to certify a plaintiff class.
Thereafter, John Mann, Steven Thomas, Lorenzo Samuel Davis, Jr., William Harry Cribb, Paul Chavis, Renee Warden, Gladys Delgado and Betty Belton moved for similar relief.
Defendant Cesar Perales, as Commissioner of the New York State Department of Social Services (the State), does not oppose plaintiffs’ application to convert this proceeding into a plenary action, but opposes all other relief.
Defendant George Gross, as Commissioner of the New York City Department of Social Services (the City), does not oppose the intervention and the conversion motions, opposes all other relief sought, and moves to dismiss the complaint.
The application to convert this proceeding to a plenary o action is granted without opposition.
All movants have been denied Home Relief benefits and full Medicaid benefits because they are homeless and reside in emergency shelters. Plaintiff’s claims and movants’ claims present common questions of law and of fact. Accordingly, the motions to intervene are granted. (CPLR 1013.)
At the commencement of this proceeding, Mr. Thrower was residing at the Kenton Hotel,[2] a dormitory-type shelter facility in the Bowery. He alleges that many of his most basic needs were not met at the Kenton shelter. Mr. Thrower has a history of psychiatric problems and suffers from an ongoing abdominal ailment. He states that the limited medical treatment available at the shelter and at hospital emergency rooms failed to address his medical needs with a reasonable *174 degree of medical competence. He also contends that toiletries and facilities to launder clothing were not provided.
In December 1984, Mr. Thrower went to a City-run Income Maintenance Center to apply for Home Relief benefits, medical assistance and food stamps. He was denied an opportunity to do so. He represented himself at a fair hearing at which the State determined that, although the center’s refusal to process his application was improper, his residence in a shelter rendered him ineligible for such assistance.
Mr. Ogle, Mr. Mann, Mr. Thomas, Mr. Davis and Mr. Cribb sleep at the men’s shelter on Franklin Avenue in The Bronx. They describe this shelter as "a barracks-style dormitory with cots lined up in rows. Residents share common toilet and washing facilities and have no privacy for sleeping, dressing or other basic life activities.” They report frequent shortages of blankets, pillows, linens, toilet paper, toothpaste, and other toiletries. Food, which is provided on a first-come-first-serve basis, often runs out before people at the end of the line are served.
Searching for jobs and permanent housing is difficult. Subway tokens are rarely, if ever, dispensed. Because they have no money, these men are forced to go hungry if they are away 0from the shelter at mealtime. Their physical and emotional well-being are attacked by poor quality food, vermin infestation and unsanitary bathroom conditions. Finally, they report that the medical care provided by the shelter is, at best, inadequate.
Mr. Chavis is a resident of the men’s shelter at Bellevue Hospital. His allegations are similar to those of Mr. Thrower and the residents of the Franklin Avenue shelter. In addition, he claims that the shelter does not provide adequate clothing.
Ms. Warden, Ms. Delgado and Ms. Belton live at the 85 Lexington Avenue Women’s Shelter in Bedford-Stuyvesant. They allege more serious deprivations than those of their male counterparts. For example, Ms. Belton states that she lived with her six children in her preshelter apartment. Two of those children are now in foster care and four are living with relatives. The poverty spiral resulting from defendants’ policy and practice of denying Home Relief benefits and Medicaid to shelter residents might make family unification a hopeless dream. These women also claim that psychiatric, gynecological and other medical treatment is often unavailable.
*175 In sum, plaintiffs’ affidavits depict a shelter system which not only fails to meet many of their most basic needs, but also erects substantial barriers to self-care and self-support..
HISTORICAL CONTEXT
The history of public assistance in New York State reflects a steady transition away from punitive institutionalization of the poor to programs that provide cash, goods and services to restore the economically needy to self-care and self-support. Underlying this transition is a recognition of the fact that poor people are not morally defective, but victims of an often harsh economic system.
With the Public Welfare Law of 1929, New York State officially rejected the deterrent doctrine of relief, characterized by incarceration of the poor in poorhouses and prisons, in favor of noninstitutional assistance geared toward maintaining individual independence. Defendants’ policy and practice of denying Home Relief and Medicaid to the destitute homeless who reside in emergency shelters represents a resurrection of this deterrent doctrine and a rejection of the self-care and self-support principles underlying New York’s social welfare laws.
LEGAL FRAMEWORK
The New York State Constitution of 1938 makes clear the affirmative obligation of the State and its subdivisions to provide for the destitute: "The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine.” (NY Const, art XVII, § 1.)
Consistent with the constitutional mandate to provide for the "aid, care and support of the needy”, social services officials are required "to provide adequately for those unable to maintain themselves”, and, "whenever possible [to] administer such care, treatment and service as may restore such persons to a condition of self-support or self-care”. (Social Services Law § 131 [1].) Similarly, social services officials must assist people discharged from mental hygiene institutions "in their transition to a condition of self-support and self-care in the community.” (Social Services Law § 131 [2].)
The Legislature has provided for three primary programs to *176 fulfill this constitutional mandate — the Supplemental Security Income (SSI) program, the Aid to Families with Dependent Children (AFDC) program and the Home Relief program. SSI and AFDC are, in whole or in part, Federally funded.
The Home Relief program, which receives no Federal funding, was designed to assist needy people who do not receive assistance from other sources. Social Services Law § 366 (1) (a) provides that Medicaid shall be provided to people receiving, or eligible for, Home Relief.
Home Relief is defined as an allowance "for all support, maintenance and need, and costs of suitable training in a trade to enable a person to become self-supporting” (Social Services Law § 157). It is guaranteed to people who are unable to provide for themselves and do not have other sources of assistance. (Social Services Law § 158.) Home Relief benefits are paid in cash unless the recipient is unable to manage funds. (Social Services Law § 159.)
Social Services Law § 157, by precluding local reimbursement claims for "institutional care”, suggests that such care excludes residents from the Home Relief program.
Regulations promulgated by the State provide that persons in receipt of "public institutional care or public shelter care” are ineligible for Home Relief. (18 NYCRR 370.2 [c] [7].) Additionally, 18 NYCRR 605.2 (g) includes adult shelters within the definition of "public institutional care”.
However, Social Services Law § 2 (23) defines "shelters for adults” not as public institutional care facilities, but rather as "adult care facilities] established and operated for the purpose of providing temporary residential care”.
PRELIMINARY INJUNCTION
To obtain a preliminary injunction, plaintiffs must demonstrate (1) that they are likely to succeed on the merits; (2) that they will suffer irreparable harm absent preliminary relief; and (3) that the equities balance in their favor. (W. T. Grant Co. v Srogi, 52 NY2d 496 [1981].)
Defendants contend that plaintiffs are not likely to succeed on the merits because (1) as shelter residents they are in receipt of institutional care and are, therefore, under the applicable laws and regulations, ineligible for Home Relief; and (2) the shelter system meets their basic needs. I disagree.
The New York State Department of Social Services is the *177 agency charged with the administration of the Social Services Law. It has determined that shelter residents are "inmates of public institutions” and has adopted 18 NYCRR 605.2 (g) to implement that determination. The City relies on the State’s determination that shelters are institutions to justify its policy and practice of denying Home Relief to shelter residents.
While the construction given statutes by the agency charged with their administration should be upheld if not irrational or unreasonable (Matter of Howard v Wyman, 28 NY2d 434, 438 [1971]), administrative agencies may only adopt rules that further the implementation of the law, and have no authority to create rules out of harmony with the statute. (Matter of Harbolic v Berger, 43 NY2d 102, 109 [1977]; Matter of Jones v Berman, 37 NY2d 42 [1975].)
Defendants’ position that shelter residents are "inmates of public institutions” is inconsistent with the purpose of modern social welfare law in this State, and with provisions of the Social Services Law. (See, Social Services Law § 2 [23], [30]; §§ 193-202, 460-463.)
I am similarly not persuaded by defendants’ contention that plaintiffs are ineligible for Home Relief because the shelter system meets their shelter and nonshelter needs.
Nothing in the Social Services Law authorizes defendants to deny plaintiffs Home Relief and Medicaid simply because they have exercised their right to emergency shelter.[3] In fact, such a practice is fundamentally at odds with the nonpunitive and rehabilitative policy underlying New York’s social welfare laws. (See, e.g., Social Services Law §§ 131, 157; Matter of Sabot v Lavine, 42 NY2d 1068 [1977].)
Because it appears that they are likely to prevail on the merits of their claim with respect to Home Relief entitlement, plaintiffs have also established a likelihood of success with respect to their Medicaid claims. (See, Social Services Law § 366 [1] [a].)
*178 Plaintiffs have ably documented the consequences of defendants’ refusal to extend to them cash assistance under the Home Relief program and Medicaid. There is little doubt that this policy is irreparably harmful to plaintiffs. Not only do plaintiffs suffer physical deprivation from their inability to purchase basic goods and services and to participate in the Medicaid program, but they also endure psychological hardship. They are deprived of autonomy, dignity, control and freedom of movement.
Plaintiffs have also shown that the equities balance in their favor. Their "physical and emotional suffering * * * is far more compelling than the possibility of some administrative inconvenience or monetary loss to the government.” (Lopez v Heckler, 713 F2d 1432, 1437 [9th Cir 1983].)
Accordingly, plaintiffs’ motion for a preliminary injunction is granted to the extent that plaintiffs are to be provided with Medicaid and cash Home Relief grants exclusive of a shelter allowance. It is not my purpose to enable plaintiffs to receive in kind goods and services and full cash allowances. Defendants are directed to develop a plan which will permit shelter residents to choose to receive goods and services formerly provided "in kind” and to pay for them out of their Home Relief grants.
The City’s motion to dismiss is denied for the reasons the preliminary injunction motion is granted and because the complaint states valid causes of action.
CLASS CERTIFICATION
In opposition to the motion for class certification, defendants point to a significant body of case law in support of their position that when government operations are involved, the doctrine of stare decisis provides adequate protection to both present and future class members, rendering a class action unnecessary. (See, Matter of Jones v Berman, 37 NY2d 42 [1975], supra; Matter of Rivera v Trimarco, 36 NY2d 747 [1975]; Williams v Blum, 93 AD2d 755 [1st Dept 1983]; Matter of Cohen v D’Elia, 55 AD2d 617 [2d Dept 1976]; Matter of Scarpelli v Lavine, 48 AD2d 899 [2d Dept], appeal dismissed 37 NY2d 871 [1975].)
Plaintiffs have not demonstrated defendants’ deliberate re *179 fusal to apply decisions of the courts regarding the challenged policy and practice. Indeed, defendants have agreed to apply judicial rulings in this case to all persons who would fall within the proposed class.
Accordingly, plaintiffs’ motion to certify the proposed class is denied.

. By stipulation dated May 28 and May 30, 1986, plaintiffs withdrew, without prejudice, claims asserted under the Federal Food Stamp Act.

. During the pendency of this action, Mr. Thrower apparently began to receive Supplemental Security Income (SSI) benefits. A lump-sum SSI payment enabled him to secure permanent housing. His claim for retroactive benefits remains.

. The City is required to provide emergency shelter to destitute, homeless people pursuant to the consent decree in Callahan v Carey (index No. 42582/79, Sup Ct, NY County, Aug. 26, 1981) and Eldridge v Koch (98 AD2d 675 [1st Dept 1983]). The Callahan consent decree also requires the City to provide food, beds, mattresses, sheets, pillowcases, pillows, blankets, towels, soap, toilet paper and laundry service. The papers submitted strongly suggest that the City does not fulfill these obligations.