OPINION OF THE COURT
Louis B. York, J.
Plaintiff brings this action on behalf of himself and a proposed class consisting of all children who are or will be either (1) remanded by a Family Court Judge to nonsecure detention (NSD) or (2) given an “open” remand by a Family Court Judge and determined by the New York City Department of Juvenile Justice (DJJ) to be eligible for nonsecured detention. Defendants DJJ and Tino Hernandez as its Commissioner operate secure and nonsecure detention facilities for juveniles. Defendants the Office of Children and Family Services and its Commissioner John Johnson are responsible for ensuring that those facilities comply with all applicable laws and regulations. According to plaintiffs, dozens of children who have been remanded or determined eligible for NSD are housed in secure detention facilities although they are entitled to be placed in NSD group homes. Plaintiffs allege that in failing to furnish an adequate number of NSD spaces, defendants have violated their duty under County Law § 218-a (B), New York City Charter § 677 (c), Executive Law §§ 501 and 503, Social Services Law § 462-b, and 9 NYCRR 180.5. Plaintiffs further allege that defendants Hernandez and Johnson have violated their rights under the Due Process Clause in article I, § 6 of the New York State Constitution by confining plaintiffs in secure detention rather than the nonsecure detention to which they have been ordered remanded or to which plaintiffs are deemed entitled.
Background
Pursuant to New York delinquency proceedings, when a youth makes his or her initial appearance before a Family Court Judge, the Judge must determine whether to release the juvenile from police custody — or, if the juvenile has not been detained by law enforcement, whether to remand him or her to the custody of DJJ. (See, Family Ct Act § 320.5.) The Family Court Act states that the juvenile should not be detained unless the court finds either: (1) there is a substantial probability *956 of flight — that is, that the respondent will not appear in court on the return date; or (2) there is a serious risk that before the return date the respondent may commit an act which if committed by an adult would constitute a crime. (Family Ct Act § 320.5 [3].) Absent these findings, the Judge releases the youth from custody and sets the terms of release. (See, Family Ct Act § 320.5.)
While a Family Court Judge has authority to set the terms of release, the Act does not give the Judge the explicit authority to set the terms and conditions of a respondent’s remand. Historically, however, Family Court Judges have specified whether a child should be remanded to a secure facility or to a nonsecure facility (NSD). Consistent with its statutory obligations, the court directs “the least restrictive available alternative” consistent with “the interests of the [juvenile] and * * * the community.” (Family Ct Act § 352.2 [2] [a].) By specifically remanding the child to a nonsecure detention facility, the Family Court Judge orders DJJ to place that youth in an NSD group home; according to plaintiffs’ uncontroverted statement, neither DJJ nor the Office of Children and Family Services has the authority to modify a Judge’s specific remand. (See, Matter of Anthony N., 106 Misc 2d 213 [Fam Ct, Richmond County 1980] [finding legislative intent to give Judges authority to direct placement, and ordering agency to comply with court directives].)
Alternatively, a Family Court Judge might order an “open” remand, directing DJJ to make the determination. Pursuant to an open remand order, the Family Court Judge directs DJJ to determine the appropriate type of detention facility for the child. DJJ’s discretion is not unbridled, however, for the statutory requirement that the juvenile be placed in “the least restrictive * * * alternative” (Family Ct Act § 352.2 [2] [a]) remains applicable.
Following the issuance of an open remand order, DJJ transports the child to a secure detention facility where intake workers assess the child’s candidacy for NSD. Using standard forms created by DJJ, intake workers evaluate the youth’s behavior in the community, prior DJJ experiences, and other criteria to determine whether the youth poses a risk of further delinquency or flight. According to DJJ’s stated policy, a youth screened eligible for NSD must be moved to an NSD facility. Commissioner Hernandez testified before the City Council on February 23, 1998 that his goal was to move NSD-eligible open remanded children into actual NSD homes as quickly as possible.
*957 It is not disputed that there is a substantial difference between the two types of facilities. Secure detention facilities are not unlike adult jails. The children must wear uniforms and remain behind barbed wire fences and secured doors with bolts. When transported from the facility, they wear handcuffs and leg chains. The children may meet only with a few family members and only for a limited amount of time. They rarely go outdoors, and engage in few educational or recreational activities. Furthermore, guards escort and monitor them during inherently private behavior such as using the bathroom and taking a shower.
In stark contrast, nonsecure facilities provide more homelike environments where children enjoy significantly more personal freedom and responsibilities. House parents rather than guards supervise the children. The children regularly attend school; engage in sporting, cultural, and social activities; and have counseling services available to them. Through the completion of chores, successful home visits, educational progress, and adherence to the rules and procedures of the nonsecure facilities, a point system tracks appropriate behavior and enables children to “prove themselves.” This opportunity to exhibit good behavior in NSD can be critical to the disposition or sentencing of their cases.
In October of 1997, the then DJJ Commissioner testified that all NSD spaces were occupied and that 28 NSD children lived at the Spofford secure facility. In February 1998, due to the fiscal irregularities of some of their contractors, DJJ canceled two NSD contracts, thereby further decreasing NSD bed capacity by 24 beds. Since March 1998, DJJ has opened three new group homes; and, as of December 1998, it has had 115 NSD spaces authorized in NSD facilities. However, more recent numbers indicate that DJJ has been less successful in complying with Family Court orders. During early 1999, DJJ held an average of four children with NSD-specific remands in secure detention per day, in addition to the hundreds of children with open remands eligible for NSD.
Defendants acknowledge the need to resolve this bed shortage; however, they have not set forth a permanent solution to the problem. Rather than furnishing additional NSD space, DJJ’s remedial plan has been to ask Family Court Judges to change remands that would otherwise have been NSD-specific to open — which, according to DJJ, gives it more discretion regarding placement. During February and March of last year, defendant Hernandez contacted all the Family Court Judges in *958 New York City by telephone and letter unilaterally requesting they cease remanding to NSD because “complete compliance with all NSD-only remands citywide is currently a physical impossibility.” DJJ’s latest effort has been to obtain budget approval to solicit contracts on an expedited basis for three additional group homes for 36 beds.
However, according to plaintiffs, defendants’ plan will not resolve the problem. First, plaintiffs vehemently object to the practice of asking Judges to alter their rulings that children should be placed in NSD. Second, because plaintiffs estimate that hundreds of children who are NSD eligible are detained in secure facilities, 36 more beds will not provide a permanent solution.
Normally, if a child is not placed in NSD in compliance with a Family Court order, plaintiffs’ course of action is to move for contempt in his or her case. However, plaintiffs assert that, in an attempt to moot out individual claims, defendants engage in a shell game, removing one child from an NSD group home to make room for another. For example, DJJ transferred Lashawn B., issued an open remand and screened for NSD, from a group home to a secure facility to make room for an NSD-specific remand. In March 1999 a Family Court Judge granted Lashawn B.’s motion to change his open remand to NSD-specific and ordered that Lashawn be returned to NSD without further disruption in his placement. A similar situation arises when plaintiffs attempt to protect their rights on an individual basis plaintiffs contend; when one child moves for contempt based on noncompliance with a Family Court Judge’s order, DJJ moves that child into an NSD facility at the expense of another child who is or otherwise would be placed in NSD.
Furthermore, plaintiffs assert that when a Family Court Judge orders an open remand, defendants have an obligation to expeditiously determine whether to place the child in NSD or secure detention, and to place the child promptly in accordance with its determination. Plaintiffs also contend that DJJ should base its assessment on the statutory criteria. Defendants, on the other hand, argue that an open remand vests in it discretion to apply whatever criteria it deems proper, and that failure to place children in NSD in accordance with its own determinations does not place it in violation of any Family Court orders. Furthermore, by its own admission, DJJ stopped screening open remanded children at all when its NSD facilities became too full to accommodate them. For these reasons, plaintiffs argue a class action lawsuit is needed. As there is no *959 mechanism for doing so in Family Court, plaintiffs instituted the lawsuit in this court.
Class Certification
First, plaintiffs seek to proceed as a class. This issue is particularly significant in this case because the individual plaintiffs are alleging noncompliance with Family Court orders. As stated, individual challenges to these orders must be brought before the proper Family Court Judge rather than here in Supreme Court. Unless it is appropriate for plaintiffs to proceed as a class, the entire lawsuit is improper and must be dismissed.
Traditionally, the class action has been considered a way to induce socially responsible, ethical behavior by institutions and to deter institutions from engaging in policies and conduct that harm large numbers of individuals. (Pruitt v Rockefeller Ctr. Props., 167 AD2d 14, 23 [1st Dept 1991].) To obtain certification, plaintiffs must satisfy the five requirements set forth in CPLR 901 (a). (Meraner v Albany Med. Ctr., 199 AD2d 740, 742 [3d Dept 1993].) Pursuant to the statute, plaintiff must show that:
(1) the class is so numerous that joinder of all the members, whether otherwise required or permitted, is impracticable;
(2) common questions of law or fact predominate over any questions affecting individual members;
(3) the representative parties’ claims or defenses are typical of the claims or defenses of the other class members;
(4) the representative parties will fairly and adequately protect the interests of the class; and
(5) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. (CPLR 901 [a].)
The trial court has broad discretion to review applications for class certification. (Lauer v New York Tel. Co., 231 AD2d 126 [3d Dept 1997].) Furthermore, courts liberally construe the applicable criteria in favor of allowing class actions. (Brown v State of New York, 250 AD2d 314, 320 [3d Dept 1998]; Friar v Vanguard Holding Corp., 78 AD2d 83, 91 [2d Dept 1980].) This is “not only because of the general command for liberal construction of all CPLR sections * * * but also because it is apparent that the Legislature intended [the rule] to be a liberal substitute for the narrow class action legislation which preceded it.” (Friar v Vanguard Holding Corp., 78 AD2d, at 91.)
*960 As to the first criterion, no mechanical test exists to determine numerosity; furthermore, it is unnecessary to be able to ascertain the specific number of class members in order to have certification. (Friar v Vanguard Holding Corp., 78 AD2d, supra, at 96.) Instead of applying a mechanical formula, courts consider the specific facts before them, drawing “reasonable inferences and commonsense assumptions.” (Friar v Vanguard Holding Corp., 78 AD2d, at 96.) Thus, if the number of persons in the class is unknown but for other reasons joinder is impracticable, certification still may be proper. (See, Darns v Sabol, 165 Misc 2d 77, 82 [Sup Ct, NY County 1995], mod on other grounds sub nom. Hernandez v Hammons, 239 AD2d 192 [1st Dept 1997].)
The manner in which defendants shift the children into and out of secure and NSD facilities creates a transitory group. Therefore, the size of the affected population is difficult to ascertain, as is the identity of the individuals affected. For this reason, proceeding as a class is more practical than joinder, and is a superior way to protect the children’s rights. Furthermore, joinder is an impracticable alternative because future members enter and leave the class on a daily basis. (See, Darns v Sabol, 165 Misc 2d 77, 82, supra.) Current class members are periodically removed from Spofford to NSD facilities and other children who allegedly belong in NSD are brought to Spofford to replace them. Some, like Lashawn B., are shuffled back and forth between facilities. Requiring individual suits or joinder would ignore these realities and would be oppressively burdensome. (Matter of Lamboy v Gross, 126 AD2d 265, 274 [1st Dept 1987].)
Defendants contend that because remands change, and children transfer facilities or get released, individual claims for relief have become moot. Since the institution of this action, the named plaintiff, Jamie B., was transferred to an NSD group home. However, class certification can still be proper if the action raises questions of public importance which are “likely to recur and yet evade review.” (Matter of Lamboy v Gross, 126 AD2d, supra, at 273; see also, Jane B. v New York City Dept. of Social Servs., 117 FRD 64, 67 [SD NY 1987] [mootness of named plaintiff’s claim need not render controversy moot].) In Lamboy, the court certified a class consisting of homeless families eligible for emergency housing even though the named plaintiff and other class members were already provided with emergency housing. Lamboy is replete with similarities to this case. Analogous to plaintiffs’ challenge here, in Lamboy the *961 plaintiff argued that the City of New York did not comply with an administrative directive obligating it to provide emergency housing to the homeless. Just as defendants here allegedly violated numerous Family Court orders, the defendants in Lamboy repeatedly failed to provide adequate housing pursuant to court order. (See also, People ex rel. Scherz v Dennison, 209 AD2d 200 [1st Dept 1994] [under this principle, First Department reviewed appeal of order denying juvenile’s ha-beas corpus application although he had already been released from custody].)
In addition, “even if the named plaintiff [ ] [is] no longer suffering the harm alleged, since others similarly situated are, the controversy is not moot.” (Brown v Giuliani, 158 FRD 251, 265 [ED NY 1994].) To avoid declaring that the entire controversy is moot, certification can be deemed to relate back to the date the complaint was filed. (Supra.)
Second, CPLE 901 (a) (2) requires that common questions of law or fact predominate over questions affecting only individual members. (See, Friar v Vanguard Holding Corp., 78 AD2d, supra, at 98.) “The statute * * * does not require that all issues be common” (Matter of Ode v Smith, 118 Misc 2d 617, 623 [Sup Ct, Wyoming County 1983]), as differences inevitably exist among class members. In this case, the common issue of law is whether defendants are required to provide a sufficient number of nonsecure detention beds to accommodate the plaintiff class. This issue is paramount to each member, thus satisfying the second prong of the certification test.
Furthermore, commonality is satisfied when the named plaintiffs challenge a practice of defendants rather than defendants’ conduct with respect to the individual plaintiffs. (Ray M. v Board of Educ., 884 F Supp 696, 700 [ED NY 1995].) In Ray M., class certification was proper for present and future New York City disabled preschool students with limiter] English proficiency for whom defendants failed to provide the proper evaluations and/or special education services. Here, DJJ systematically placed children entitled to NSD into secure detention facilities, and even distributed letters to Judges requesting that they stop issuing orders granting juveniles NSD status. Because the activity complained of involves one set of operative facts from which plaintiffs’ claim arises, commonality is established. (See also, Ackerman v Price Waterhouse, 252 AD2d 179, 200-201 [1st Dept 1998] [finding investors’ claims typical despite some differences].)
Defendants also note that intake workers consider the particular factual circumstances of each child when determining *962 the appropriate level of supervision. They argue that if the court grants the requested relief, it will have to make case-by-case determinations based on these previously considered facts about which children should remain at Spofford, which should be placed in NSD and which should be released. This, they state, bars certification.
Here, however, the common factual question is whether defendants have provided a sufficient number of NSD beds. The specific circumstances considered by the intake workers do not alter plaintiffs’ eligibility for NSD once the finding of eligibility has been made. (See, Matter of Santana v Hammons, 177 Misc 2d 223 [Sup Ct, NY County 1998] [in action brought by workfare participants deemed employable with limitations, challenging agency’s failure to accommodate class members’ physical limitations, certification was proper although members had distinct disabilities].) Because of this, “[t]he unique circumstances of each child do not compromise the common question of whether, as plaintiffs allege, defendants have injured all class members by failing to meet their * * * obligations.” (Marisol A. v Giuliani, 929 F Supp 662, 690 [SD NY 1996], affd 126 F3d 372 [2d Cir 1997].) This is true even if there are variations in the types of irreparable injury suffered or the length of the delay prior to a juvenile’s placement in NSD. (See, Brown v Giuliani, 158 FRD 251, supra [regarding benefits due to AFDC and EAF recipients].)
Third, the claims or defenses of named plaintiff must be typical of the claims or defenses of the class. Jamie B. claims that defendants violated their obligation to provide him a space in nonsecure detention. This claim is identical to that of the other members of the class. All of them face the same compelling circumstance: that of being housed in secure detention facilities although they were entitled to be in NSD group homes. Thus, plaintiffs satisfy the typicality requirement. (Friar v Vanguard Holding Corp., 78 AD2d, supra, at 99.)'
Fourth, the representative plaintiff must adequately represent the interests of the class. Thus, if a conflict of interest exists between Jamie B. and the other children, the court must deny certification. In considering the adequacy of the representative, a court evaluates whether there are any conflicts between the representative and the class members, the representative’s familiarity with the case, the representative’s financial resources, and the competence of class counsel. (Ackerman v Price Waterhouse, 252 AD2d, supra, at 202.)
Defendants do not challenge the competence or the experience of plaintiffs’ counsel. However, they assert that counsel *963 might experience a conflict of interest in the future, if defendants are found in contempt of court and the court directs them to release any children for whom they cannot find proper housing. In this case, they contend, the Legal Aid Society, which represents the proposed class, will need to determine which children should be released from DJJ custody. However, defendants’ argument fails for two reasons. First, the court does not intend to direct the release of any of the sentenced juveniles. The role of the judiciary is to direct the administrators to comply with their legal obligations — not to supplant the role of the Family Court or of DJJ. In cases in which courts have ordered the release of inmates or similarly drastic remedies, the defendants had repeatedly failed to comply with judicial directives to follow their legal duties. This court anticipates that defendants in this case will not conduct themselves in such a fashion. At any rate, the scenario that defendants posit is too remote and speculative to cause this court to deny plaintiffs application for class certification.
Moreover, even if, as defendants suggest, the court did order the release of some of the class members, that would not necessarily pose a conflict of interest. In that instance, the court would have to monitor the process; it would not entrust the decision-making to the counsel for the plaintiff class. At that juncture, instead, the court might direct that a neutral special master be appointed to make the determination.
Fifth, the class action must be the best method for adjudicating the controversy. The court concludes that a class action is clearly the best means to proceed in this situation. As explained earlier, plaintiffs have attempted to proceed on an individual basis, but to no avail. Indeed, one juvenile’s relief often comes at the expense of another child. Moreover, by writing to Judges and asking them to change their sentencing policies on a wholesale basis, defendants are already treating the juveniles as a class. In light of this, it is more fitting to address the problem in the context of a class action.
In addition, practical considerations militate in favor of adjudicating the controversy in a class action. As discussed in more detail below, the indigence of some of the juveniles makes it more appropriate to enable them to obtain class-wide relief rather than proceed individually. (See, Tindell v Koch, 164 AD2d 689, 695 [1st Dept 1991]; Matter of Brown v Wing, 170 Misc 2d 554, 560 [Sup Ct, Monroe County 1996], affd 241 AD2d 956 [4th Dept 1997].) The judicial economy of resolving the issues in a class action rather than in numerous contempt *964 proceedings also weighs in favor of certification. Another consideration is the desire to prevent inconsistent rulings on the issues. (See, Butler v Wing, 177 Misc 2d 779, 784 [Sup Ct, NY County 1998].) Finally, a class action will enable the implementation of procedural safeguards that will protect the rights of juveniles before they have been violated rather than after the fact.
Thus, the five prerequisites for class action have been satisfied. Nonetheless, defendants argue that certification is unnecessary because subsequent claimants will be adequately protected by stare decisis. (See, Williams v Blum, 93 AD2d 755 [1st Dept 1983]; Thrower v Perales, 138 Misc 2d 172 [Sup Ct, NY County 1987].) However, the principle, called “the government operations rule,” does not bar certification. Instead, the rule only “cautions against class certification where governmental operations are involved, since any relief granted to the named plaintiffs would adequately flow to and protect others similarly situated under principles of stare decisis.” (New York City Coalition to End Lead Poisoning v Giuliani, 245 AD2d 49, 51 [1st Dept 1997].) Where the governmental entity repeatedly has failed to comply with court orders, class certification is proper. (Supra.) Here, plaintiffs have shown that there has been a repeated and serious problem, and, indeed, the City defendants’ own letters and papers indicate that at regular intervals, there has been failure to comply with NSD-specific remands. Stare decisis has been of no avail.
Recently, the government operations rule did not preclude class certification where there was a continued failure to propose a remedial plan. (Chalfin v Sabol, 247 AD2d 309 [1st Dept 1998].) In that case, defendants did not propose a plan for remedying the problems stemming from a Medicaid regulation declared void by Seittelman v Sabol (158 Misc 2d 498 [Sup Ct, NY County 1993]), a prior decision. In another action, challenging the Social Services Department’s decision to terminate home hearings for disabled applicants, “defendants’ demonstrated reluctance to extend the * * * injunctive relief to individuals other than the named plaintiffs” justified the certification of the class. (Varshavsky v Perales, 202 AD2d 155, 156 [1st Dept 1994].) For reasons similar to those set forth in Chalfin and Varshavsky, certification is proper here.
In addition, when plaintiff’s ability to defend a suit on the merits is compromised, it is easier for courts to find an exception to the government operations rule. (New York City Coalition to End Lead Poisoning v Giuliani, 245 AD2d, supra, at 51; *965 Matter of Lamboy v Gross, 126 AD2d 265 [1st Dept 1987], supra; Matter of Santana v Hammons, 177 Misc 2d 223 [Sup Ct, NY County 1998], supra.) Jamie B. and the class he represents consist of incarcerated, indigent children who would confront extreme difficulties if they were to initiate individual actions. Many lack the resources, understanding or awareness to enforce their rights in separate individual lawsuits. To further complicate matters, a representative would be required to initiate each one of the litigations because infants lack the capacity to sue. (CPLR 1201 et seq.) Due to these circumstances as well, it is proper to apply the exception to the government operations rule.
Finally, the government operations rule is not applied “where the condition sought to be remedied by the plaintiffs poses some immediate threat that cannot await individual determinations.” (New York City Coalition to End Lead Poisoning v Giuliani, 245 AD2d, supra, at 51, citing Matter of Lamboy v Gross, 126 AD2d 265 [1st Dept 1987], supra.) In Coalition, for example, the First Department affirmed the certification of a class despite the government operations rule because the class members, subject to lead paint problems in their residences, were exposed to “serious health hazard[s] requiring immediate action.” (New York City Coalition to End Lead Poisoning v Giuliani, 245 AD2d, at 52.) As stated, plaintiffs have shown that exigent circumstances exist; if prior to sentencing they remain in secure detention rather than NSD, the juveniles’ sentences, and lives, can be negatively affected.
Not only is a class action appropriate for these reasons, in addition, it will further the goal of “ ‘inducing socially and ethically responsible behavior’ ” on DJJ’s part. (Pruitt v Rockefeller Ctr. Props., 167 AD2d, supra, at 23; accord, Friar v Vanguard Holding Corp., 78 AD2d, supra, at 94.) Between June 1998 and the start of 1999, DJJ was able to accommodate most of the NSD-specific remands. However, in court conferences, it made clear that it did not feel statutorily obliged to do the same with open remands, and it did not report any statistics relating to compliance with open remand orders. Moreover, because there have been recent surges in the number of NSD remands, and numerous youths with open remands deemed eligible for NSD are in secure detention, hundreds of children are being housed in conditions more restrictive than those which Family Court Judges and DJJ deem necessary. Failure to provide adequate NSD space results in defendants’ failure to comply with court orders.
*966 On February 13, 1999, after noncompliance with an NSD remand order for a class member, a Brooklyn Family Court Judge refused to grant DJJ’s application to change the youth’s remand status to open. Then, on February 26, after refusing to grant DJJ’s second application for changing the child’s remand to open, the Judge released the child. On March 12, 1999 after DJJ’s continued noncompliance with an NSD-speciflc remand order, a Family Court Judge directed DJJ to move Juanita J. into an NSD group home. In their submission dated March 15, 1999, plaintiffs document additional instances in which Family Court Judges have expressed their frustration with the City defendant, scheduling contempt hearings and even holding the City in contempt in the case of Shanetta W. Yet, for the reasons already set forth in great detail, the situation cannot be remedied simply by proceeding in the individual Family Court cases. Thus, this class action is necessary.
Because of this strong social purpose and because of the importance of resolving the obvious problems and confusion regarding the placement of the juveniles, the class action is a method “ ‘superior to other available methods for the fair and efficient adjudication of the controversy.’ ” (Altman v Commodity Exch., 1996 WL 523532, 2 [Sup Ct, NY County, NY, July 5, 1996, Schlesinger, J.] [citing statute].) Furthermore, the behavior of DJJ “in seeking to moot the claim of each named plaintiff without addressing the underlying [problem] * * * demonstrates why a class action is needed here.” (Brown v Giuliani, 158 FRD 251, 269 [ED NY 1994], supra.)